Judge Robertson
delivered the opinion of the Court.
Patton, Hackley and Greenbow, being the owners of 36,000 acres of land, on Richland, in *51 £tns state, entered 20,406 1-4 of it in 1796, for taxes.' The taxes not having been paid on it for the years 1800-1-2-3,-it was exposed to sale, by the register, for the amount due, and John Logan, Joseph Welsh and John Ballinger jointly, purchased 9060 1-4 acres of it, for $60 92 1-2 cents.
Logan afterwards, claiming the whole 9060 acres, as purchaser of the interests of Welsh and Ballinger, sold 200 acres to Andrew Craig, and executed to him a bond fora conveyance.
Craig sold the 200 acres to Michael Myres, to whom he delivered Logan’s bond, without assignment, and his own bond, binding himself to procure for Myres, or any other person who might purchase from him, the title from" Logan, on or before the 13th day of May, 1817.
This bond being assigned to Richard Ballinger, he assigned it, and also delivered Logan’s bond to Zad-dock Martin, on the 23d. of May, 1816, who shortly afterwards settled on the land.
In September, 1819, Logan, Ballinger and Welsh being dead, and no title having been made to them, or either of them, by the register, nor any by Logan to Craig or Martin, Craig brought a suit in chancery, against the register, the heirs of J. Ballinger and the-unknown heirs of Logan and Welsh, and against Patton, Hackley and Greenhow,for the title.
In July, 1820, Martin recovered a judgment against Craig, on his bond, for $754, and costs.
To injoin this judgment, and compel Martin, to. accept a conveyance for the land, in lieu of it, whenever the title could be obtained, Craig filed an amended bill, making Martin a party, and charging that Martin had never intimated to him, during the life of Logan,jthat he was desirous to obtain a title, and that if he had, he would have procured one for him; but that after Logan’s death, Martin, knowing that a title could not be made instantly, demanded one, but refused to surrender to him Logan’s bond, to enable him to procure it for him.
An injunction being granted, Martin answered, and alleged that he had been anxious to obtain the- *52 and had manifested his anxiety to Craig, without effect; that he knew nothing of the state of the title? when he bought Craig’s bond from Ballinger; (hat ho did not believe a good title could be procured; that lie had made valuable improvements on the land, but having despaired of ever obtaining a title, he had beer; compelled to sell at a sacrifice, and had removed to Missouri; that he offered Craig a copy of Logan’s; bond, protested against the injunction,and resisted a specific execution, if Craig could even succeed in getting the title.
The case being heard on the amended bill, the injunction was dissolved with damages, and the bill dismissed with costs.
To reverse this decree, this writ qf error is prosecuted, with a supersedeas.
When the decree was rendered, the whole case as to all parties, was prepared for hearing. There had been regular publications against the unknown heirs, and against Patton, Haclcley and Grcenhow, and the, heirs of J. Ballinger had answered, by their guardian ad litem.
In the meap time, the register had made to Craigt a deed, in obedience to an act of assembly directing him to do so. This act could not divest the original owners^ or the purchasers at the Register’s sale, of their rights to. the land. As to fhem, if they or any of them should choose to assert right, (he act was without authority, and consequently, would be void.
But if this deed did not vest in Craig such a title as would enable him to pass a good and perfect title to Martin, he had prepared his suit in such a manner as to present a strong claim in equity, to a decree for a title. We will not, however, now decide, whether he has shown himself entitled to a decree for a title, because, as we shal.l be compelled to decide that the circuit court had no right to enforce a specific execution, against the will of Martin, it would be premature to give any other decision which might affect the right of persons not now before us, and which are, as iar as we know, “sub judice” in the circuit court.
Aiter c°v®-eiecled to sue at law, and obtained ¿hanoellor not Compel him >c ao, ^foi-'^mce \¡alesí he ha’s procured of 'Pen fraud or cut-Pable ne^~ oau'e’d'dehc-quency of covenantor, or lulled him into security an<i passiveness‘
Not duty pf covenantee (jeétMf (ime f0r makingit isfixed.
•if it weie admitted that, when the decree was ¿ered, Craig was entitled to a decree for a title, nevertheless, he had failed to show that his against Martin’s judgment ought to have been perpetuated, and l$art}n compelled to accept a title -when decreed to himself.
Martin had elected to sue at law, for damages, for a breach of Craig’s covenant for a title. He had fairly obtained a judgment. The chancellor should not control this election, and deprive him of hisjudgment, unless hp had procured it unfairly, or had been guilty of fraud or culpable negligence, which occasioned or contributed t.o the omission of Craig, to procure the title for him, or whi.ch lulled Craig, without any fault on his part, into security and passiveness. It not only does not appear that Graig could haye procured the title, but it is shown, undeniably, by' his own bills and other facts in the record, that it was impossible, by any ordinary legal means, for him to Ijave made to Martin a good title, within the time stipulated in his covenant. The register had refused, and for a sufijeient reason, to make a deed to Logan and Co.
But it was not the duty of Martin to demand a doed-, the time for making it was fixed. It was Craig’s duty to procure the title and convey it to Martin, on or before the 13th of May, 1817. He made no effort to do so, and it is not shown that, until after that time, Martin manifested any indisposition to receive a title, or that he did or omitted to do any thing, which lulled Craig or obstructed any effort by him to obtain the title. Nor does it appear that May-tin was ever unwilling to receive the title, before he removed, or determined to remove to Missouri, which was long after the breach of the covenant by Craig. There is no principle of equity, nor any authority of any court, which would tolerate a perpetuation of Craig’s injunction, under such circumstances, as those which characterize this case. But the case of Royster vs. Shackleford, V. Littell’s Reports, 228, and of Oldham vs. Woods, III. Monroe, 47, and many others which might be cited, conclusively show that, in such a case as this, the vendee should not be compelled to accept a title and surrender his judgment for damages.
When vendee it in possession gad vendor, without any positive fault, has omitted, or from state of title, has been unable to comply with cove-céllorwill" on application of vendor, decree specific performance. Generally, m such cases, time is notes-¡f good, title can bo made reasohable tipfbo^om-pelled to ac-copt it.
*54 The case of Cotton vs. Ward, III. Monroe, 312, is not, when scrutinized, an opposing authority. No principle settled in this case, is inconsistent with that established in those first cited. Cotton had conveyed the title to Ward, and put him in possession; and having obtained a judgment against him for a part of the consideration, Ward injoined it for alleged defects in the title. Pending the injunction, Ward brought a suit for a breach of the covenant of seisin, and recovered damages. Cotton filed an amended answer, in the nature of a cross bill injoining this judgment, and being able to exhibit, on the hearing, a perfect title, Ward’s injunction was dissolved and Cotton’s perpetuated, whereby Ward was compelled to keep the title and give up his judgment for damages.
The contract was not executory, it was executed. And every intelligent lawyer will instantly recognize the essential difference in the equity, incident to executed and executory contracts. The cases are comparatively few, in which an executed contract will be rescinded, without proof of fraud.
There is another distinguishing and important circumstance, peculiar to the case of Cotton vs. Ward. When Ward recovered his judgment for damages, a suit was pending, (brought by himself,) in which the question to be decided was, whether he should be compelled to hold to his title, or should be allowed to rescind his contract. For the only alternative, in that case was, a dissolution of his injunction, or a recision of his executed contract.
His attitude was, therefore) different from that in which this record presents Martin; and the rule of equity which should govern each case, is as different.
The cases are numerous in which the chancellor will decree a specific execution, on the application of the vendor, after the time stipulated for a conveyance. Such a decree will be proper, whenever the vendee is in possession, and the vendor, without any positive fault, has omitted, or, on account 'of the state of the title, has been unable to comply punctually, with his covenant. Generally, in such cases as this, time will be considered by the chancellor, as mot essential; and if the vendor can procure a good title, the-vendee will *55 Be compelled to accept it. Such a decree, in such a case, would be consistent with the fundamental and universal principles of equity.
j5Ut vendor wjll not be allowed time, apply to chancellor |°as disaffirm» iawTorSshew that’twas impossible to before breach of covenant, and that «en-of title when he purchased. Vendee in. contract,ana recovering ^on^conve°--' ance°°iabie for rents, but valuable m-muirtbede-dwkd.
If, in such a case, the title can be made in a reasonable time, the vendee will be compelled to take it. I. Mad. Chy. 349. J
And time will even be allowed, in some cases, to enable the vendor to procure title. Sug. Ven. 252. r °
The reason of this doctrine of equity, applied with decisive effect, in the case of Cotton vs. Ward. But it does not apply, in the slightest or remotest degree, to this case, or to any such case as this. It is restricted to.cases in which the vendor applies for a specific execution, before the vendee shall have disaffirmed the contract, and sought redress, in a court of Jaw, for the breach of it by the vendor,, or, in which the delay in making the title, resulted, riot from the negligence or delinquency of the vendor, but from a defect in the title, which rendered it impossible to procure a perfect title, before a recovery of damages, ■fairly at law, for a failure to eonyey against the day /designated in the covenant, and of which defect (he vendee had notice when he bought the land.
We have seen no case, either the letter or reason of which, would sanction a decree compelling Martin to surrender his judgment. Nothing fraudulent or delusory is proved against him; nor is it shown that he knew that the title was defective when he bought, But still there is error in the decree. Martin had occupied the land several years. This was beneficial to him and prejudicial to Craig, as the land must devolve on Craig. Equity would, therefore, exact of Martin some allowance for rent. The prayer for general relief by Craig, authorized a decree for the profits. If these exceed the value of the valuable and lasting improvements made by Martin, the residuum should have been decreed to Craig. The court ought, therefore, to have taken an account of the rents, and of the improvements, and if the former had exceeded the latter, decreed a perpetuation of the injunction, “pro tanto.” See Woods vs. Oldham, III. Monroe, 47.
Danny, for plaintiff; Otiltenden, for defendant.
Martin recovered interest on the consideration.
Wherefore, the decree is reversed, and the cause remanded, with instructions to institute such proceedings and render such decree as shall be conformable to this opinion.